# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2016-CA-00129-SCT

*CLAYTON FRANK GUTIERREZ*

*v.*

**TRISHA GUTIERREZ**

| | |
|---|---|
| DATE OF JUDGMENT: | 12/28/2015 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| TRIAL COURT ATTORNEYS: | DEAN HOLLEMAN |
| | DAVID ALAN PUMFORD |
| | HAROLD O. GRISSOM, JR. |
| | ROBERT THOMAS SCHWARTZ |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID ALAN PUMFORD |
| ATTORNEY FOR APPELLEE: | DEAN HOLLEMAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/15/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

## CONSOLIDATED WITH

## NO. 2016-CA-00393-SCT

*CLAYTON FRANK GUTIERREZ*

*v.*

**TRISHA GUTIERREZ**

| | |
|---|---|
| DATE OF JUDGMENT: | 02/25/2016 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | DAVID ALAN PUMFORD |
| ATTORNEY FOR APPELLEE: | DEAN HOLLEMAN |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 06/15/2017 |
| MOTION FOR REHEARING FILED: | |

MANDATE ISSUED:

**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     On December 4, 2014, this Court issued its opinion in ***Gutierrez v. Gutierrez***, 153 So. 3d 703 (2014), in which it affirmed the chancellor's judgment in part and reversed it in part, remanding the case for the resolution of three overarching issues.  Clayton Gutierrez now appeals the chancellor's decisions concerning the issues on remand, as outlined in the chancery court's September 22, 2015, December 29, 2015, and February 26, 2016, orders. In all, Clayton alleges five errors.  Finding that the court neither abused its discretion nor erred in its decision, this Court affirms the chancellor's judgments on the matter.

### FACT SUMMARY AND PROCEDURAL HISTORY

¶2.     After twenty-two years of marriage, Trisha Gutierrez filed for divorce from her husband in March 2010.  Shortly thereafter, Clayton Gutierrez (Clay) responded with a counterclaim for divorce.  Initially, both parties asserted various fault grounds for their petitions, though the couple eventually settled on an irreconcilable-differences divorce. The parties quickly agreed to custody and visitation arrangements for their three children, leaving the division of marital assets and liabilities and spousal support as the only matters to be resolved. To date, the primary source of disagreement in this cause surrounds the division of the parties' second mortgage,[1] the award of alimony, and a judgment for contempt.

---

[1] The second mortgage referred to throughout this opinion was secured during the marriage to purchase two parcels of land, identified throughout the litigation as the Deep Creek Lots in Stone County.  After the parties purchased the land, their marital home–which

2

*Procedural History*

¶3.     Since 2010, this matter has proceeded through two trials, review by the Supreme Court, and multiple chancery court hearings, judgments, orders, and revised orders. This represents the third appeal to this Court on the matter, all of which have been presented by Clay.[2]

¶4.     Clay's first appeal was decided by this Court on December 4, 2014. ***Gutierrez v. Gutierrez***, 153 So. 3d 703 (Miss. 2014). There, Clay presented four issues, each addressing the chancellor's evaluation of the marital property and debt. ***Gutierrez***, 153 So. 3d at 707. To address those issues, this Court reviewed the chancellor's April 23, 2013, Corrected Final Judgment on Divorce, which granted the parties' petition, adopted their child-custody and visitation agreements, and detailed the chancellor's division of marital assets and liabilities. Finding the chancellor made no error in his valuation, this Court affirmed the chancery court's assessment of Clay's interests in three individual companies; though the Court remanded on issues concerning the calculation and distribution of assets and liabilities, as well as the chancellor's findings on alimony, contempt, and attorney's fees. ***Gutierrez***, 153

---

served as security for the loan–was foreclosed upon and sold. The sale proceeds from the foreclosure sale produced sufficient proceeds to pay off the home's first mortgage with roughly $100,000 remaining to apply toward the second mortgage. The balance of the second mortgage remains as the only liability at issue in this matter.

    [2] Clay's third appeal focused squarely on the chancellor's February 25, 2016, judgment and was consolidated with his second appeal, which asserted errors in the September 2015 and December 2015 judgments. The consolidation of the second and third appeals represents the case before the Court today.

So. 3d at 714. On remand, the chancery court addressed these concerns in the following three judgments.

***September 22, 2015, Judgment***: *Second Mortgage Distribution*

¶5.     Through its 2014 decision, this Court requested that the chancery court provide a more definite explanation and finding regarding the second-mortgage debt. ***Gutierrez***, 153 So. 3d at 709. In doing so, the Court recognized (1) that Clay, individually, maintains the legal and financial obligation under the note; (2) Trisha was not a maker of the note and did not sign it;[3] (3) and at that point in the litigation, the holder of the note had yet to make a demand for the deficiency. The Court then asked two questions of the chancellor: first, if the holder obtains a deficiency judgment, what are the respective obligations of the parties regarding repayment? Next, as a party not obligated under the note, can Trisha be held legally responsible for the deficiency if Clay cannot pay?

---

[3] Trisha was listed on the marital home as an owner, however, and likely signed the Deed of Trust pledging the marital home as security for the debt.

¶6. In its September 22, 2015, M.R.C.P. 54(b) Certified Judgment,[4] the chancery court sought to clarify its original ruling and refine its determination regarding the second mortgage and the subsequent assessment of alimony. First, the court determined that including the liability for the second-mortgage debt in the distribution of the assets would be inequitable because the bank had yet to collect actively on the note.[5] Because the court could not speculate that the bank eventually would initiate collection efforts, or predict if the debt would be settled in the future for less than the amount owed, the chancellor decided to refrain from charging the amount to either party. Rather, he amended his original decision and removed the debt allocated to both Trisha's and Clay's respective columns. The court then provided for joint responsibility between the two parties, making each accountable for one-half of any payment made toward the debt. The court recognized that, while Clay retains the sole legal liability to Wells Fargo, his obligation is contingent and unliquidated. The court

---

[4] "Rule 54(b) is designed to facilitate the entry of a final judgment upon one or more but fewer than all the claims or as to one or more but fewer than all the parties in an action involving multiple claims or multiple parties, so as to enable the non-prevailing party to perfect an appeal as of right of a final judgment ." M.R.C.P. 54 Advisory Committee Notes. The Rule allows a trial court to certify an "interlocutory order as a final judgment if the court determines that" to do otherwise may unreasonably delay a party's appeal. *Id.* However, Rule 54(b) certification usually is reserved [only] for cases in which delay of the appeal might prejudice a party. *See* ***Cox v. Howard, Weil, Laboussie, Friedrichs, Inc.***, 512 So. 2d 897, 900 (Miss. 1987). A Rule 54(b) certification should be granted "cautiously in the interest of sound judicial administration in order to preserve the established judicial policy against piecemeal appeals." ***Id.*** *see also* ***Indiana Lumbermen's Mut. Ins. Co. v. Curtis Mathes Mfg. Co.***, 456 So. 2d 750, 752-53 (Miss. 1984).

[5] Notably, the court did receive evidence of a form of demand issued in August 2014. This document was one-page, unsigned, and appeared to the court to be incomplete. Additionally, Clay made $250 payments to Wells Fargo each month between January and July 2015. The court considered these events together and determined they did not amount to an active collection effort by the bank.

held that making both parties equally responsible for any payment amount negotiated, settled, or other wise agreed to provides for joint responsibility without charging the amount to either party. The court then readopted and reincorporated its previous distribution of the remaining assets and liabilities from its April 23, 2013, Judgment, taking all other issues under advisement.

**December 29, 2015, Judgment**: *Contempt and Attorney's Fees*

¶7. Following the September 2015 Judgment, each party filed a motion questioning or disputing the chancellor's findings. The December 29, 2015, Judgment addressed both motions in turn, along with questions regarding claims of contempt in 2012 and 2015.

¶8. The chancellor first addressed Clay's post-trial motion, which argued that the court had failed to address all issues on remand together. Clay claimed that this Court requires matters of equitable distribution and alimony to be considered together, rather than in the isolation of an Rule 54(b) certified judgment. He argued that, as a result, the chancellor's ruling directly conflicted with the Court's requests on remand. Next, Clay claimed that the chancellor's removal of the second mortgage from the marital estate and the allocation of joint payment responsibility to the parties ignored the requests of this Court by assessing the debt as a liability to both parties. Clay requested the chancery court set aside the Rule 54(b) Certified Judgment and leave him solely responsible for the debt and diminishing assets. He contends that this decision would conform with this Court's mandate while significantly decreasing the lump-sum alimony award to Trisha from $215,138.50 to $33,136.[6]

---

[6] It appears that Clay borrowed these numbers from his October 2015 Post Trial Motion and erroneously included them with other estimates in his brief. Ironically, while

6

¶9.    The court quickly dismissed Clay's motion, maintaining the position that "the contingent nature of the loan, while a marital debt, would make it inequitable to include the liability in the equitable distribution of the assets." The court then readopted its original *Armstrong*[7] analysis, removing the contingent Wells Fargo debt and reincorporating its previous equitable distribution of the remaining marital assets and liabilities.

¶10.    Next, the chancellor reviewed Trisha's Rule 59 Motion, which asserted that the Court's September 2015 *Judgment* failed to set forth a starting point for lump-sum alimony payments. While the previous judgment reincorporated the analysis in the April 23, 2013, Corrected Final Judgment, including the amount of payments to be made and the duration of payment activity, the information therein did not identify when those payments were to begin. The chancellor recognized this oversight and determined that payments would begin February 1, 2016, continuing each year thereafter, until the amount was paid in full.

¶11.    Last, the chancellor addressed claims of contempt from 2012 and 2015. The first of the contempt issues–Contempt 2012–was addressed by this Court in 2014 and primarily concerned Clay's failure to pay debts and expenses as ordered by the court on May 4, 2010, and July 8, 2011. In *Gutierrez*, this Court held that the chancellor's March 23, 2012, Contempt Judgment focusing on the court's May 2010 and July 2011 temporary orders was

---

Clay argues that the court's decision to remove the second mortgage from the distribution created a *mathematical error*, his calculations throughout this first issue often fail to check out. After further analysis, it seems his proposal to move the entire second mortgage to his column would change Tricia's total assets from $35,685 to $206,503. This would decrease Clay's total assets from $465,962 to $295,144, creating a total marital disparity of $88,640, and decreasing Clay's lump-sum alimony requirement to $44,320.50.

[7] *Armstrong v. Armstrong*, 618 So. 2d 1278 (Miss. 1993).

"manifestly in error." *Gutierrez*, 153 So. 3d at 713. The Court found that the July 2011 "temporary order created several obvious ambiguities regarding Clayton's continuing support obligations." *Gutierrez*, 153 So. 3d at 715. Those ambiguities created confusion which "arguably excused Clayton from continuing to pay Trisha's monthly expenses, or, at the very least, make the $750 monthly 'other support' payments." *Gutierrez*, 153 So. 3d at 713. Although Clay admitted his failure to pay for some of Trisha's valid monthly expenses, this Court reversed the chancery court's contempt judgment and award of attorney's fees and remanded the issue for the chancery court to resolve the ambiguity in its previous orders and determine Clay's actual deficiency. *Gutierrez*, 153 So. 3d at 714. In a succinct, two-paragraph response, the chancery court merely acknowledged the issue in this order and reassessed Trisha's award, amending it to reflect the additional amount owed from March 2012, along with attorney's fees.

¶12. The final issue–Contempt 2015–addressed both parties' claims for reimbursement for expenses incurred on behalf of the minor children. Having found no contempt in the issue, the court dismissed it without merit.

### *February 25, 2016, Judgment*: *Alimony and Contempt*

¶13. Following the entry of the court's December 2015 Judgment, Trisha filed her second Rule 59 Motion requesting the court to amend the judgment to set forth that Clay is ordered to pay her $3,000 per month in periodic alimony, and to define the expenses to be divided by the parties which are to be considered "college expenses." Shortly thereafter, Clay filed his Post-Trial Motion requesting the court to revisit its decision on the second mortgage,

8

resolve the ambiguity in the court's prior orders regarding responsibility for expenses, and make findings on the issues of periodic alimony and expenses specific to the children.

¶14.    Addressing the matter of periodic alimony first, the court performed a new *Armstrong* analysis in light of its September 22, 2015, Judgment*,* its reconsideration of the equitable distribution and the subsequent removal of the second-mortgage debt.  In examining the test's twelve factors, the 2016 analysis produced nearly identical results to the 2013 review. However, the court acknowledged that, within the three years that had passed, Trisha had significantly reduced her standard of living in response to a request by the court, though she continued to struggle to meet her monthly obligations. Conversely, while Clay did not yet own a home, he continued to maintain a high standard of living with no evidence that he could not meet his basic needs. Further, the court noted that, while the Wells Fargo debt was removed from the obligations and assets summary, the discrepancy–and Tricia's deficit–remained the same. Finally, the court provided a thorough explanation of its first lump-sum-alimony determination, readopting its initial award to counter the shortfall created by Clay's receipt of many of the unliquidated marital assets.  Through this second *Armstrong* analysis, the court found that Trisha should receive periodic alimony in the amount of $3,000 per month in addition to the previously awarded lump-sum payments.

¶15.    After settling the matter surrounding alimony, the court turned to the issue of college expenses for the two minor children.  In its 2013 judgment, the court mandated that expenses outside the previously established, prepaid college fund are to be paid sixty percent by Clay and forty percent by Trisha. Here, the court clarified that college expenses consist of "an

amount equal to those charged by the University of Southern Mississippi for tuition, fees, books, room and board, the cost of school supplies, and a laptop computer."

¶16. The final issue addressed by the court in this judgment concerned the Contempt 2012 matter discussed in the December 2015 Judgment. Because this Court found the language of the May 2010 and July 2011 temporary orders created "several obvious ambiguities regarding Clayton's continuing support obligations," the chancery court offered a comprehensive clarification on the matter. *Gutierrez*, 153 So. 3d at 715. The court explained that the language of the July 2011 temporary order, which removed Clay's obligation to pay "other marital necessities of the wife," was intended to impose a new and separate obligation upon the parties. As a result, Clay no longer was responsible for paying the "necessities of the marriage" mandated under the May 2010 temporary order; rather, he was to maintain responsibility for all the debts of the marriage, with the exception of five specific bills which Trisha would pay through the court registry.

¶17. Having simplified the requirements of the parties, the court then recognized that: (1) Trisha's evidence and testimony of the financial obligations she had incurred since May 2010 were both credible and unchallenged, (2) Clay's statements conveyed a higher earning capacity than Trisha's without providing evidence to the contrary, and (3) unprovoked, Clay admitted to contemptuous behavior. As a result, the court found Clay to be in contempt of the previous temporary orders for his repeated failure to pay the required family expenses and entered a judgment against him in the amount for $17, 588.50, in addition to attorney's fees of $5,000.

¶18. On appeal, Clay alleges that the chancery court erred as a matter of law, abused its discretion, was manifestly wrong, or committed plain error in its findings in each of the three judgments. Clay alleges these errors through five individual issues, though, because issues II and III focus on the chancellor's decision on periodic and lump-sum alimony, we address them together.

## STANDARD OF REVIEW

¶19. "In matters of equitable distribution and alimony, the Court enjoys only limited powers of review. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Henderson v. Henderson*, 757 So. 2d 285, 289–90 (Miss. 2000) (citing *Hammett v. Woods,* 602 So. 2d 825, 827 (Miss. 1992)). Likewise, a "chancellor has substantial discretion in deciding whether a party is in contempt." *R.K. v. J.K.,* 946 So. 2d 764, 777 (Miss. 2007)*, disapproved of on other grounds in later appeal,* 30 So. 3d 290 (Miss. 2009). Because this Court employs a limited standard of review when evaluating the decisions of a chancellor (*Reddell v. Reddell,* 696 So. 2d 287, 288 (Miss. 1997)), his findings will be disturbed only when they are manifestly wrong, clearly erroneous, or if the chancellor applied an erroneous legal standard. *McEwen v. McEwen*, 631 So. 2d 821, 823 (Miss. 1994).

## ANALYSIS

I.     **Whether the chancellor erred in his calculation of the marital assets and liabilities on remand and improperly decided the issue separately from the context of alimony.**

11

¶20. As detailed above, the chancery court addressed this issue on remand in its September 2015 Rule 54(b) Certified Judgment. There, the chancellor sought to clarify his rationale with respect to the removal of the second-mortgage debt from the allocation of assets and liabilities. The chancellor maintained that, because the debt was incurred during the marriage, it represents a marital liability for the purpose of equitable distribution, but because it is unliquidated and may never be collected, dividing the debt or attributing it to one party alone would be inequitable. Instead, the chancellor created a joint obligation between the parties, holding Trisha and Clay equally responsible for any future payments made on the note.

A. *The chancellor properly issued the Rule 54(b) Certified Judgment, dispensing of the second-mortgage debt prior to his reconsideration of alimony.*

¶21. Under this issue, Clay first argues that the chancellor erred in considering the second mortgage in isolation, rather than ruling on its equitable distribution and alimony together. Quoting the conclusion of this Court's December 2014 decision,[8] Clay claims that the Court's plain language required that the chancellor consider all issues on remand together. In his argument, however, Clay failed to acknowledge the Court's analysis and the caselaw upon which it stood, in earlier paragraphs of the same decision. In discussing the issue of lump-sum and periodic alimony, the Court explained that

> [t]his case is being remanded for the chancery court to determine whether Trisha or Clayton has any legal responsibility to repay the second mortgage and to reallocate the mortgage liability accordingly. Where it is necessary to

---

[8] "Because equitable distribution and alimony must be considered together, we must also reverse the chancellor's award of alimony to Trisha." *Gutierrez*, 153 So. 3d at 714.

12

reverse the chancery court's division of the marital estate, an accompanying award of alimony should also be reversed, as a reallocation of marital assets and liabilities may obviate the need for alimony.

*Gutierrez*, 153 So. 3d 703, 711 (Miss. 2014). Here, the Court's decision to reverse the award of alimony was necessitated by its reversal of the chancellor's distribution of the second mortgage. Citing *Lauro v. Lauro*, we explained that "[a]n award of alimony can be determined only after the chancellor has equitably divided the marital estate and determined that one spouse has suffered a deficit." *Gutierrez*, 153 So. 3d at 711 (citing *Lauro v. Lauro,* 847 So. 2d 843, 848 (Miss. 2003)). Having established that the chancellor erred in the distribution of marital assets, it follows that the lower court's calculation of alimony also may be in error. This Court then reversed the award of alimony, instructing the chancellor to reconsider them together.

¶22. This instruction did not mandate that the second mortgage and alimony assessment be determined simultaneously, however. Rather, the Court followed the principle we outlined in *Ferguson v. Ferguson*, recognizing that

> "[a]limony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." *LaRue v. LaRue*, 172 W. Va. 158, 181, 304 S.E.2d 312, 334 (1983). (Neely, J., concurring). Thus, the chancellor may divide marital assets, real and personal, as well as award periodic and/or lump sum alimony, as equity demands.

*Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994) (quoting *LaRue v. LaRue*, 172 W. Va. 158, 181, 304 S.E.2d 312, 334 (1983)). Therefore, the equitable distribution of assets and liabilities, along with the allocation of alimony, are distinct parts to the same whole.

13

Alimony cannot be determined without the court first distributing the marital property; though the two matters need not be determined concurrently, but only as *equity demands.*

¶23.    Accordingly, we find that Clay's argument is without merit. As previously discussed, Clay's only support for this claim appropriates a useful phrase from the analysis in ***Ferguson*** and the conclusion in ***Gutierrez***, and then fails to interpret the language in the context of the Court's full opinion.   As precedent dictates, after the character of the parties' assets and liabilities is determined pursuant to ***Hemsley v. Hemsley***, 639 So. 2d 909 (Miss. 1994), a chancellor is within his discretion to distribute marital assets according to ***Ferguson***, 639 So. 2d 921. ***Lauro***, 847 So. 2d at 848.  Then, "[i]f the situation is such that an equitable division of marital property, considered with each party's non-marital assets, leaves a deficit for one party, [ . . . ] alimony based on the value of non-marital assets should be considered." ***Lauro***, 847 So. 2d at 848 (quoting ***Johnson v. Johnson,*** 650 So. 2d 1281, 1287 (Miss.1994)).  "In the *final analysis*, all awards should be considered together to determine that they are equitable and fair." ***Ferguson***, 639 So. 2d at 929 (emphasis added).  By determining that the second mortgage should be divided equitably upon payment, and then later evaluating the amount and necessity of alimony through an extensive ***Armstrong*** analysis, the chancellor properly "reconsider[ed] not only the issue of equitable distribution, but also the awards of [lump sum and periodic] alimony . . . after he has properly divided the marital assets." ***Lauro***, 847 So. 2d at 848.

> B.    *The chancellor properly held the second mortgage to be a marital debt and a joint obligation of the parties.*

14

¶24. Next, Clay asserts that the second mortgage is his financial and legal obligation, making it his sole responsibility to repay the debt. He claims that, because there is no privity between the note-holder and Trisha, the bank's only legal remedy is against Clay, releasing Trisha from any repayment responsibility. Clay argues that his independent legal obligation to repay the note–if and when it comes due–renders the second mortgage an individual debt, and not a marital debt subject to division. He insists that the chancery court's decision to divide any payment of the debt between the parties ignores his solitary legal obligation and contradicts this Court's instruction on remand.[9] As a result, Clay requests that this Court reverse the chancery court's decision, leaving him with responsibility for the entire debt under the second mortgage. He notes that doing so would decrease the division of assets, leaving both parties with a marital estate valued at $239,644, and reducing the lump-sum alimony award to Trisha from $215,139.50 to $33,136.00.

¶25. In its September 2015 and February 2016 Judgments, the chancery court reiterated that, although Clay individually maintains legal liability to the mortgagee, the second mortgage was incurred during the marriage and therefore is a marital debt for the purposes of equitable distribution. The court determined that, while this debt was marital, it also was contingent upon the holder's decision to collect on the note, making it impossible for the court equitably to divide the parties' present responsibilities to the holder. The chancellor

---

[9] To be clear, the Court remanded the issue of the second-mortgage distribution for clarification on (1) whether Trisha can be held responsible for paying the deficiency if Clay cannot pay, and (2) what the parties' respective obligations become in the event the holder obtained a deficiency judgment. Further, the Court requested clarification on the chancellor's distribution of the debt and his reasoning as to the allocation of debt to Trisha as a nonobligee. *Gutierrez*, 153 So. 3d at 708-09.

15

then completely removed the debt from its calculation, providing for joint obligation to the holder should it be collected in the future. The chancery court noted that, while Trisha is not in privity with the bank, the chancellor's judgment holds her legally responsible for one half of the debt, should it be collected in any form. As a result, Trisha and her counsel will receive notice of any future collection activities and negotiations regarding the debt, while the lower court will hold her responsible for any failure to fulfill her joint obligation.

¶26.    The "[d]ivision of marital assets is now governed under the law as stated in *Hemsley* and *Ferguson*[, whereby . . .] the character of the parties' assets, i.e., marital or non-marital, must be determined pursuant to *Hemsley* [and then. . .] equitably divided, employing the *Ferguson* factors as guidelines." *Lauro*, 847 So. 2d at 848 (quoting *Johnson,* 650 So. 2d at 1287). "We define marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage." *Hemsley*, 639 So. 2d at 915. "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994). "Assets so acquired or accumulated during the course of the marriage are marital assets and are subject to an equitable distribution by the chancellor." *Hemsley,* 639 So. 2d at 915.

¶27.    Aside from a few limited exceptions, this Court consistently has considered liabilities and assets together, giving them equal consideration under *Hemsley*.[10]  In the matter before

[10] For exceptions to this rule, see *Lowrey v. Lowrey*, 25 So. 3d 274 (Miss. 2009), in which this Court adopted precedent set by the Court of Appeals and held that in situations

us, the chancellor painstakingly considered whether the note, issued individually under Clay's name, could be distributed as a marital debt. He then properly assessed the debt as marital property, considering it alongside the marital assets, and then appropriately divided it between the parties. Further, following instruction from this Court on remand, the chancellor explained his rationale for the division, clarifying that Trisha could be held liable by Clay only in the event of her own nonpayment, and that–under the joint obligation–if the note holder obtains a deficiency judgment, Trisha is obligated to repay Clay for fifty percent of the payment he remits. Within the three judgments, the chancellor answered the Court's questions in detail, justifying his decision on remand. Because the broad, inherent equity powers of the chancery court establish its authority to divide marital assets (*see* Miss. Code Ann. § 93-5-23 (Rev. 2013)), and because the chancellor here supported his findings by "substantial credible evidence in the record," we find that the court did not err in the calculation of marital assets on remand. ***Hammett v. Woods****,* 602 So. 2d 825, 827 (Miss.1992).

## II.     Whether the chancellor's decisions on alimony were in error.

¶28.    The chancery court's February 25, 2016, Judgment addressed both the lump-sum and periodic-alimony assessments which the court readopted following its findings in the September 2015 and December 2015 judgments. Therein, the court determined that the equitable distribution of assets and liabilities left Trisha with a deficit of $215,139.50. The

where a "spouse's wasteful dissipation exceeds what would have been the value of the marital estate absent the wasteful dissipation," that spouse should receive nothing from the court's equitable distribution. *See also **Dunaway v. Dunaway***, 749 So. 2d 1112 (Miss. Ct. App. 1999), and ***Childs v. Childs***, 806 So. 2d 273 (Miss. Ct. App. 2000).

chancellor ordered that Clay reduce this discrepancy over the course of five years through payment of lump-sum alimony in equal installments of $43,027.90, due on the first day of April each year, beginning April 1, 2016. After conducting a second *Armstrong* analysis, the court then determined that an award of permanent periodic alimony also was necessary to allow Trisha to meet her monthly needs while providing her with funds to begin making monthly payments on outstanding financial obligations. As a result, the court ordered Clay to make monthly alimony payments in the amount of $3,000, beginning on March 1, 2016.

### A. Whether the court erred in awarding Trisha lump-sum alimony on remand.

¶29. Clay's first argument stems from the court's award of lump-sum alimony. Clay rehashes his argument from Issue I, above, asserting that the second-mortgage debt remains his responsibility and therefore should be assessed as his liability alone. He argues that the court's mathematical error in partially attributing the second-mortgage debt to Trisha inflated the deficit and resulted in the erroneous decision to award both periodic and lump-sum alimony. He claims, however, attributing the $364,101.53[11] note to his column would reduce Trisha's deficit from $215,138.50 to $44,320.50,[12] reflecting a more equitable (and seemingly favorable) distribution of the marital assets. Clay then revisits the argument that

---

[11] Clay provides that this is the amount owed on the note as of August 8, 2014.

[12] Clay requests that the court decrease the award from $215,139.50 to $33,136. Though, as addressed *supra,* Clay's brief contained inconsistent calculations as they pertained to the division of assets. For continuity purposes, we employ the accurate calculations used in the opinion rather than the numbers Clay provides.

18

to decide alimony separately from the equitable distribution of marital assets and liabilities was an error which must be reversed.

¶30. "Upon remand, the chancellor must reconsider not only the issue of equitable distribution, but also the awards of alimony . . . after he has properly divided the marital assets." *Lauro*, 847 So. 2d at 848. In that respect, both assets and liabilities accumulated during the course of a marriage are subject to equitable division unless they are characterized as separate property. *Id.* at 847 (citing *Johnson,* 823 So. 2d at 1161). "As noted above, the chancellor was also instructed to revisit the award of alimony as alimony and equitable distribution are to be considered together." *Id.* at 849. However, the record has shown the issues of alimony and marital-asset distribution may be considered separately when the chancellor considers all awards together in the final analysis "to determine that they are equitable and fair." *Ferguson*, 639 So. 2d at 929. Because the accuracy of the chancellor's September 2015 Judgment has been thoroughly discussed, we will not again address its merits. Finding that the removal of the second-mortgage debt was proper, and the deficit calculation was correct, we find that the chancellor properly concluded that lump-sum alimony was an appropriate means to achieve financial equity.

> **B.** *Whether the court erred in its decisions to award Trisha periodic alimony and to increase the amount of periodic alimony on remand.*

¶31. Clay continues his allegations of error by asserting that there was no justifiable need for the court to award alimony, either periodic or lump-sum. He claims that, because the previously addressed valuation and calculation of the marital assets was incorrect, any further

19

alimony analysis was tainted. After conducting his own *Amstrong* analysis, Clay argues that, because he is left with both the express and implied responsibility for the majority of the marital debt, the need for any form of alimony is further eliminated.

¶32. Once again, having addressed the accuracy of the court's findings concerning the distribution of the second mortgage, we will not rehash the matter and instead turn to the issue of periodic alimony. Applying the analysis from its September 2015 judgment, the chancery court conducted a new *Armstrong* review to determine if alimony should be awarded in light of the court's decision to remove the second mortgage from the distribution calculation. Through the multiple factors, the chancellor determined that "Clay's earning potential and the court's finding of undisclosed income, Trisha's deficit after equitable distribution, and Trisha's monthly expenses which exceed her income even after having reduced her standard of living," each contributed to the court's award of permanent alimony.

¶33. This Court recognizes that, "[a]s in most states, there are no specific guidelines indicating what form of alimony should be awarded or the appropriate amount or duration" in Mississippi. Deborah H. Bell, *Bell on Mississippi Family Law*, 236 (2005). *"*It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor." ***Creekmore v. Creekmore***, 651 So. 2d 513, 517 (Miss. 1995) (citing ***Cherry v. Cherry****,* 593 So. 2d 13, 19 (Miss. 1991)). As a result, the chancellor is given wide latitude in determining an alimony award.

¶34. Here, the lower court's thorough analysis spanned four pages of the February 2016 Judgment and addressed each *Armstrong* factor with particularity. Noting that, although the

parties maintained extravagant lifestyles when married, Trisha worked throughout this litigation to decrease her living expenses and alter her way of life. However, even with significant strides to reduce her living standards, Trisha still was unable to meet her monthly needs. Because Clay maintains a higher earning capacity, has not reduced his standard of living, and offered no evidence that he cannot meet his basic needs, the court determined the evidence warranted an award of periodic alimony. It then exercised its discretion and granted Trisha a $3,000 per-month-award.

¶35. We advance the standard that "[a]limony, if allowed, should be reasonable in amount, commensurate with the wife's accustomed standard of living, minus her own resources, and considering the ability of the husband to pay." *Creekmore*, 651 So. 2d at 517. "The amount of alimony awarded is a matter primarily within the discretion of the chancery court because of its peculiar opportunity to sense the equities of the situation before it." *Tilley v. Tilley*, 610 So. 2d 348, 351 (Miss. 1992). Therefore, an award of alimony is left to the discretion of the chancellor, and "this Court will not overturn the court on appeal unless its findings were manifestly wrong." *Duncan v. Duncan,* 774 So. 2d 418, 419 (Miss. 2000). Having reviewed the applicable criteria, we find that the chancellor was well within his discretion on remand in awarding both amounts of lump-sum and periodic alimony, and that these awards were reasonable under the circumstances.

> III. **Whether the chancellor erred in failing to award or credit Clay for the amount of court-ordered expenses attributed to the minor children.**

21

¶36. Following the 2014 decision by this Court, Clay filed a Petition for Citation for Contempt. Trisha responded to his petition and countered with her own Motion for Citation for Contempt and Modification of Corrected Judgment, which was followed by Clay's answer on the same and his first Motion to Dismiss. Throughout these pleadings, both parties asserted that the other was deficient in his or her payment for the minor children's expenses and thus in contempt of the 2013 judgment. These costs included medical premiums, clothing, and college expenses, among others. The court addressed these claims for reimbursement in its December 2015 Judgment. In its succinct response to the claims, the chancery court disposed of this issue and provided that it found no contempt as neither of the parties had made a demand of the other until after the matter was remanded. However, in its detailed February 2016 Judgment, the court revisited the issue in an effort to clarify its original order. Referencing only the parties' responsibility for the children's college expenses, the court ruled that

> The two minor children have 3 years of pre-paid college tuition. Any additional college expenses–*an amount equal to those expenses charged by the University of Southern Mississippi for tuition, fees, books, room and board, the cost of school supplies and a laptop computer*–shall be paid sixty percent (60%) by Clay and forty percent (40%) by Trisha.

(Emphasis added to amended portion.) With this revision, the court also renewed its dismissal of the parties' contempt requests. Neither party filed a Rule 59 motion following the entry of the February 2016 Judgment.

¶37. Challenging the chancery court's decision to dismiss his claims, Clay requests that this Court reverse and remand the chancellor's ruling, or alternatively, offset and credit specific

22

amounts owed to him against those the Court determines that he may owe Trisha. In arguing his claim, Clay asserts that the clarification provided in the February 2016 Judgment modified Trisha's obligation for college expenses, though the court later denied her requests for other modifications in the same ruling. Clay then rehashes arguments made in his earlier pleadings in an effort to convey that Trisha's contempt was deliberate, knowing, and willful. Ultimately, as a result of Trisha's contumacious conduct and his disproportionate financial support of the children, Clay claims that the court would be justified in rendering an award of more than $30,000 in reimbursement.

¶38.    Trisha's response to Clay's argument is twofold. First, she provides that, having failed to file a Rule 59 motion to ask the chancellor to review and/or correct his findings in the February 2016 Judgment, Clay is barred from raising the argument on appeal. Next, she asserts that, in his analysis, Clay's failure to support his argument with relevant law renders his claims ineffective. This Court finds Trisha's argument to be persuasive.

¶39.    It long has been established that a party may not raise an issue for the first time on appeal, because to do so prevents the lower court from addressing the alleged error. *Crowe v. Smith*, 603 So. 2d 301, 305 (Miss. 1992) (citations omitted). For this reason, parties must address certain errors in a Rule 59 motion or they will not be considered on appellate review. *McLemore v. State*, 669 So. 2d 19, 24 (Miss. 1996). "These include all new matters, motions made upon the ground of inadequate or excessive damages, motions made for new trial where it is contended that the verdict is against the overwhelming weight of the evidence, and the denial of a continuance." *McLemore*, 669 So. 2d at 24. Moreover, this Court has

23

held that failure to cite any authority in support of claims of error precludes it from considering the specific claim on appeal. *See generally* **Grey v. Grey**, 638 So. 2d 488, 491 (Miss.1994).

¶40.    Between the December 2015 Judgment (which first addressed the 2015 contempt claims) and this appeal, Clay filed just one pleading which addressed the chancellor's findings.  His January 2016 Answer to Trisha's Rule 59 motion also included a Post Trial Motion and a Motion for Specific Findings of Fact and Conclusions of Law.  Therein, Clay addressed the second mortgage and its removal from the calculations of equitable distribution and alimony and its relation to expenses incurred on behalf of the children, and the 2012 contempt findings.  While Clay uses this motion to suggest that the lower court offset and credit any expenses owed to him against those that he may owe Trisha, he does not do this in reference to the possibility of a 2015 contempt judgment award, but to the claimed child-related expenses and his responsibility for periodic alimony.  Not once does Clay mention his obligation to pay college expenses or any other necessities as suggested by his brief to this Court, nor does he make a demand for the court to render an award in any amount.  Rather, after admitting that neither party previously had made a demand on the other, he suggests only that the most equitable result would be for the parties' claimed expenses to "wash," leaving him with responsibility for the children's expenses, and therafter removing the need for Trisha to receive periodic alimony.  Throughout his pleadings and his brief, Clay supports his arguments with facts alone, failing to include any caselaw as it applies to the

24

matter. Instead, he provides a new *Armstrong* analysis to suggest that, in light of his continuing support of the children, the need for periodic alimony is eliminated.

¶41. Because Clay's argument under this issue is not one that was presented to the trial court and fails to be supported by relevant law, this Court declines to pass judgment on the chancellor's decision.

> **IV.** **Whether the chancery court erred by holding Clay in contempt of court on remand, and subsequently awarding Trisha a judgment and attorney's fees.**

¶42. In our December 2014 opinion, we found that "the chancellor's [2012] contempt judgment and award of attorney's fees against Clayton was manifestly in error." *Gutierrez*, 153 So. 3d at 713. Because there were "several obvious ambiguities regarding Clayton's continuing support obligations," we remanded the issue of contempt and attorney's fees for the court to resolve any confusion and then determine the amount of Clay's deficiency, if any. *Gutierrez*, 153 So. 3d at 713-14.

¶43. On remand, the chancellor addressed the matter of the 2012 contempt in both the December 2015 and February 2016 judgments. In the first judgment, the chancery court held that its finding of contempt was valid, though the amount failed to include expenses for March 2012. The court then modified the original judgment and assessed an award against Clay in the amount of $17,588.50 plus attorney's fees, totaling $5,000. The chancellor then issued his February 2016 Judgment, which provided the parties far more detail than had the prior decision. There, the court referenced the two temporary orders which created the ambiguity and then addressed this Court's request on remand, stating

> In its July 8, 2011 order, this [c]ourt's inclusion of the sentence, "this does away with the language of the prior Temporary Order wherein Clay was ordered to pay the other marital necessities of the wife" was intended to impose completely new obligations upon the parties.

The court then offered an in-depth explanation of its judgment in an effort to clarify the ruling. In brief, the court intended for the July 2011 Temporary Order to impose a new obligation, replacing the "necessities of the marriage" provision in the May 2010 order. This would leave Clay responsible for the debts of the marriage and eliminate the other obligations under the previous order. The court then engaged in a brief discussion of the evidence and testimony presented on the contempt matter where it reaffirmed its December 2015 award finding Clay in contempt.

¶44.  Clay argues the chancellor erroneously found him in contempt of the 2011 temporary order. He claims that he fully complied with the order's requirements and regularly paid for the necessities of the children, whether they were court-ordered or not. Clay argues that because he was no longer required to pay for the "necessities of the wife," and because Trisha acknowledged that he had made those payments set forth in the order, he cannot logically or legally be held in contempt for nonpayment. He further argues that, because he justifiably cannot be held in contempt for willfully and deliberately disobeying the Temporary Order, he likewise cannot be required to pay Trisha's attorney's fees.

¶45.  However, Clay's argument misrepresents both the chancellor's orders and the in-court testimony provided at trial. First, it is abundantly clear from the record that Clay failed to comply with the court's July 2011 Temporary Order. Whether ambiguous or not, Clay admitted to the court–and this Court recognized on appeal–that he had failed to reimburse

26

Trisha for some of her valid monthly expenses, an admission which, on its own, may warrant an finding of contempt. *Gutierrez*, 153 So. 3d at 714. Next, Clay asserts that, during the August 2015 trial, Trisha acknowledged that Clay previously had made the payments set forth in the order. However, those four payments Trisha admits to receiving were not paid to her by Clay, but were disbursements from the court registry[13] to pay for her gas and groceries; the marital home's water, sewer, and cable bills; and the children's dance classes. *Gutierrez*, 153 So. 3d at 712. Finally, he claims that the chancellor disregarded the mandate from this Court by failing to make new findings to support the contempt award. This Court finds the argument meritless. The chancery court, in its February 2016 Judgment, clarified its July 2011 Temporary Order in which it referenced in-court testimony, expense summaries provided by Trisha, and receipts for items to be reimbursed. There, the court reiterated that, prior to April 2013, "[i]n multiple court appearances, Clay admitted his contempt, and during trial, he again acknowledged his failure to make court-ordered payments to Trisha for some of her valid monthly expenses." It then clarified that, through the July 2011 order, the court intended that

> "necessities of the marriage" as stated in the order of May 4, 2010 be replaced. Rather than maintaining Clay's responsibility for reimbursement to Trisha for payment of marital necessities, which had proven unworkable, the Court sought to impose a completely new obligation. As of the May 4, 2010 order, Clay was no longer responsible for paying "the necessities of the marriage," but rather, was to maintain responsibility solely for the debts of the marriage.

---

[13] During the pendency of the litigation, the parties had to sell many assets to enable them to continue paying necessary expenses. The proceeds of these sales were deposited in the court registry and disbursed to pay the parties' attorney's fees, expert-witness fees, and other expenses.

The Court acknowledged that the Temporary Order also removed Clay's "obligation for five (5) specific bills: her auto gas, household groceries, water/sewer bill, cable, and dance classes, all of which were previously Clay's obligation under the previous order." The court reaffirmed its contempt ruling based on the findings outlined in the Judgment, evidence provided at trial, Trisha's unrefuted testimony, and Clay's admission of his contempt.

¶46. In light of the explanation of the chancellor's findings on contempt, we are not persuaded by Clay's claim of error. In general, "[a] chancellor has substantial discretion in deciding whether a party is in contempt." *R.K. v. J.K.,* 946 So. 2d 764, 777 (Miss. 2007) (citing *Lahmann v. Hallmon*, 722 So. 2d 614, 620 (Miss. 1998)). The chancellor, who sits in the unique position to observe the parties and their demeanor, the evidence, and the testimony, "is infinitely more competent to decide [contempt matters] than we are." *Mabus v. Mabus*, 910 So. 2d 486, 491 (Miss. 2005); *Cumberland v. Cumberland,* 564 So. 2d 839, 845 (Miss. 1990). Because contempt is an issue of fact to be decided on a case-by-case basis (*Mizell v. Mizell,* 708 So. 2d 55, 64 (Miss. 1998)), these "matters are committed to the substantial discretion of the trial court." *Cumberland,* 564 So. 2d at 845. Therefore, "this Court will not reverse a chancellor's finding where it is supported by substantial credible evidence." *Varner v. Varner*, 666 So. 2d 493, 496 (Miss. 1995) (quoting *Shipley v. Ferguson,* 638 So. 2d 1295, 1297 (Miss. 1994)).

¶47. This Court has held that "[a] defendant may avoid a judgment of contempt by establishing that he is without present ability to discharge his obligation." *Gebetsberger v. East*, 627 So. 2d 823, 826 (Miss. 1993). While "a citation for contempt is proper *only when*

28

*the contemner has willfully and deliberately ignored the order or the court*" (***Stevison v.***

***Woods***, 560 So. 2d 176, 180 (Miss. 1990) (emphasis in original)), if the contemnor raises

inability to pay as a defense, the burden is on him to show this with particularity, not just in

general terms. ***Morreale v. Morreale***, 646 So. 2d 1264, 1267 (Miss. 1994); ***Newell v.***

***Hinton***, 556 So. 2d 1037, 1042 (Miss. 1990); ***Varner***, 666 So. 2d at 496. Though he does

not discuss this on appeal, Clay defended his failure to pay with claims of inability to pay

and allegations of glaring ambiguity in the court's Temporary Orders. The court quickly

disposed of his first defense, noting the evidence indicated that he had adequate income and

earning potential to fulfill his obligations. His claim of ambiguity, however, reached this

Court on appeal and was remanded for clarification by the chancellor.

¶48.    Although a party may not be held in contempt for a failure to comply with an order

that is too vague or ambiguous to be understood, such an order need be only reasonably

specific. ***Moses v. Moses***, 879 So. 2d 1036, 1040 (Miss. 2004) (holding that, due to the

vagueness of the amended final judgment of divorce, the trial court abused its discretion in

finding the appellant in contempt); ***Davis v. Davis (Dooley)***, 829 So. 2d 712, 714–15 (Miss.

Ct. App. 2002) (holding that an order for a husband to pay all but three specific debts was

not too ambiguous for compliance).[14] Here, the court clarified that parts of the May 2010

---

[14] The Court of Appeals' opinion in ***Davis v. Davis (Dooley)*** is instructive. There, the chancellor held that Ms. Dooley would be assessed "all obligations of the parties, *except the three debts set forth in the Opinion of the Court*. . . ." ***Davis***, 829 So. 2d at 714 (emphasis in original). Mr. Davis failed to satisfy these debts and claimed that the language in the divorce judgment did not explicitly require that he make the payments. ***Davis***, 829 So. 2d at 713. The court found that there could be no confusion about to whom the debts were allocated, noting "that the only possible interpretation of either the opinion or the judgment is that the chancellor recognized that Ms. Dooley had caused the debts to be

order were to be replaced by those in the July 2011 order. We agree that the language of the July 2011 Temporary Order, replacing provisions of the previous order, could be construed in more than one way. However, the July 2011 additions in no way could have been interpreted to excuse Clay completely from his responsibilities to remit *any* payments to Trisha. Most notably, the Order required that he maintain responsibility for all remaining marital debts, minus the five bills being paid through the court registry. Because Clay failed to prove he was unable to pay the court-ordered amounts due to his inability or the order's ambiguity, this Court finds that his arguments fail.

## CONCLUSION

¶49. Through three separate judgments and painstaking analysis, the chancellor resolved this Court's concerns regarding the equitable distribution of the second mortgage and the parties' respective obligations; the issue of ambiguity in the court's temporary orders and its subsequent finding of contempt; and the awards of periodic and lump-sum alimony. Finding that one issue is procedurally barred and that the lower court committed no error on those issues properly before us, we affirm the chancellor's findings on remand.

¶50. **AFFIRMED.**

**RANDOLPH, P.J., COLEMAN, MAXWELL AND CHAMBERLIN, JJ., CONCUR. DICKINSON, P.J., CONCURS IN PART AND DISSENTS IN PART**

---

incurred, but as part of resolving the financial aspects of divorce, Mr. Davis would pay them." *Id.* at 714. In the case before us, the chancellor made a similar finding in his July 2011 Order: although it is not explicit, the order suggests that there are debts to be paid, and Trisha was responsible for only those enumerated. Consequently, Clay must be responsible for the remainder.

30

**WITH SEPARATE WRITTEN OPINION JOINED BY WALLER, C.J., KITCHENS AND KING, JJ.**

**DICKINSON, PRESIDING JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶51. Before his first trip to this Court, the chancellor held Clayton in contempt and ordered him to pay attorney fees. Clayton appealed and we reversed, finding "the chancellor's contempt judgment and award of attorney's fees against Clayton was manifestly in error."[15] Our reason was that a portion of the contempt judgment rested on Clayton's failure to comply with ambiguous provisions in the chancellor's orders, and our law precludes a finding of contempt-based noncompliance with an ambiguous order.[16] So, because any portion of the contempt judgment and attorney fees associated with noncompliance with the ambiguous provisions was improper, the chancellor, on remand, was supposed to have separated out and excluded from the award of attorney fees those associated with the ambiguity.

¶52. Instead, on remand, the chancellor once again held Clayton in contempt for all nonpayment. This was improper. We made it clear that no contempt judgment ever could rest on Clayton's failure to comply with the ambiguous provisions. The chancellor should have determined how much of Clayton's nonpayment resulted from the ambiguity, and removed that amount from the contempt judgment. Because he failed to do so, I would reverse and remand on that issue, and I must concur in part and dissent in part.

---

[15] *Gutierrez v. Gutierrez*, 153 So. 3d 703, 713 (Miss. 2014).

[16] *Id.* at 713–14 (quoting *Switzer v. Switzer*, 460 So. 2d 843, 846 (Miss. 1984)).

31

¶53.   In a May 4, 2010, temporary order, "the chancellor ordered Clayton to 'continue to pay the necessities of the marriage, including but not limited to utilities, mortgages, cellular telephones, automobile notes, automobile insurance, health insurance, gas and groceries of the wife'" and "'to pay Trisha $750 per month for 'other expenditures.'"[17]

¶54.   On July 8, 2011, the chancellor ordered "the chancery clerk to release $2,250 per month from the court registry for the next four months to Trisha to pay for her gas and groceries; the marital home's water, sewer and cable bills; and the children's dance classes"[18] He also ordered that "'[a]ll marital debts, including the marital home electricity bill, previously paid by [Clayton] per order of this Court shall continue to be his responsibility until further order of this Court,'" but that "'[t]his does away with the language of the prior Temporary Order wherein [Clayton] was ordered to pay the other marital necessities of the wife.'"[19]

¶55.   In the April 23, 2013, judgment of divorce, the chancellor held Clayton in contempt for failure to pay sums due under the temporary orders.  He awarded Trisha a contempt judgment of $16,019 plus $2,500 in attorney's fees.[20]  Clayton appealed the contempt judgment and argued "that the chancellor's May 4, 2010, temporary order and July 8, 2011,

---

[17] *Gutierrez*, 153 So. 3d at 711.

[18] *Id.* at 712.

[19] *Id.*

[20] *Id.*

temporary order create ambiguity regarding his support obligation, which the chancellor never resolved."[21]

¶56.    This Court found "that the chancellor's contempt judgment and award of attorney's fees against Clayton was manifestly in error" because "'no charge of contempt will be sustained where the final decree is insufficient to advise the party affected in clear and unequivocal language of that which he has been ordered to do.'"[22]  According to this Court, "the July 8, 2011, temporary order created several obvious ambiguities regarding Clayton's continuing support obligations" and because of those ambiguities "a genuine dispute existed as to whether Clayton was required to make those payments after July 2011."[23]

¶57.    In other words, we found that Clayton could not be held in contempt because the orders did not define his duty to pay with "clear and unequivocal language."  The reasoning underlying this holding is clear: "[t]o be found in contempt, a party has to willfully and deliberately violate a court order."[24]  And "[a] party does not willfully and deliberately violate an order if the order is unclear."[25]

¶58.    Ordinarily, this would end the inquiry; we would reverse and render the judgment of contempt because no contempt judgment could rest on an order that was ambiguous when

---

[21] *Id.* at 713.

[22] *Id.* (quoting *Switzer*, 460 So. 2d at 846).

[23] *Gutierrez*, 153 So. 3d at 711.

[24] *McKnight v. Jenkins*, 155 So. 3d 730, 732 (Miss. 2013) (citing *R.K. v. J.K.*, 946 So. 2d 764, 778 (Miss. 2007)).

[25] *McKnight*, 155 So. 3d at 732 (citing *Cossitt v. Cossitt*, 975 So. 2d 274, 279 (Miss. Ct. App. 2008)).

allegedly violated. But in the first appeal of this case, Clayton had "admitted that he had failed to reimburse Trisha for some of her valid monthly expenses."[26] So we found "a finding of contempt may be in order."[27] While Clayton could not be held in contempt for any nonpayment that occurred because of the ambiguity, he could be held in contempt for any failure to comply with any unambiguous obligations.

¶59.    I believe we remanded the contempt issue to the chancellor for that purpose: to determine what portion of the contempt resulted from the ambiguity, and to hold Clayton in contempt only for any nonpayment that did not result from the ambiguity. Unfortunately, our directions for the chancellor on remand were less than clear. We stated "the chancery court must resolve the ambiguity in its previous orders before it can determine the actual amount of Clayton's deficiency. Accordingly, we reverse the chancery court's contempt judgment and award of attorney's fees and remand this case for further proceedings."[28]

¶60.    On remand, the chancellor understood this statement to mean he should explain what he actually meant in the July 8, 2011, order, then hold Clayton in contempt for all nonpayment, disregarding the fact that we already had held that some of the order was ambiguous when Clayton failed to make payment. This does not comport with our law.

¶61.    As explained above, ambiguity in an order absolves a litigant of contempt for failure to follow the order's ambiguous provisions because contempt must be willful and deliberate,

---

[26] *Id.* at 714.

[27] *Id.*

[28] *Id.*

34

and a litigant cannot willfully and deliberately disregard an unclear duty. Obviously, this cannot be remedied after the fact: the chancellor explaining what he meant after the alleged contempt occurred cannot transform the litigant's failure to comply into a willful and deliberate act. If the order was unclear when the alleged contempt occurred, no contempt ever can rest on the unclear duty.

¶62. So I once again would reverse the chancellor's judgment of contempt. I would remand this case to the chancellor to do what I believe our first opinion tried to order: determine which portion of Clayton's alleged contempt resulted from the ambiguous provision of the order, which portion resulted from the clear portions of the order, and to enter a judgment for the latter only.

**WALLER, C.J., KITCHENS AND KING, JJ., JOIN THIS OPINION**.