# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2025-CA-00119-COA

## CONSOLIDATED WITH

## NO. 2023-CA-00515-COA

MARCUS BANKS                                                           APPELLANT/
                                                                       CROSS-APPELLEE

v.

DEBORAH BANKS                                                          APPELLEE/
                                                                       CROSS-APPELLANT

DATE OF JUDGMENT:            11/19/2024
TRIAL JUDGE:                HON. CATHERINE FARRIS-CARTER
COURT FROM WHICH APPEALED:  LEFLORE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:     KATRINA SANDIFER BROWN
ATTORNEY FOR APPELLEE:      SABRINA D. HOWELL
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
DISPOSITION:                ON DIRECT APPEAL: REVERSED AND
                            REMANDED.  ON CROSS-APPEAL:
                            REVERSED AND REMANDED - 05/26/2026
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND McCARTY, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Marcus Banks appeals from the Leflore County Chancery Court's judgment of
divorce, claiming that the court erred in dividing the couple's marital property, awarding
alimony, and granting attorney's fees.  Deborah cross-appeals, contending that certain real
property was erroneously classified as non-marital property.  Having reviewed the record,
arguments of the parties, and relevant caselaw, we reverse and remand on direct appeal and
cross-appeal.

## FACTS AND PROCEDURAL HISTORY

*The Marriage*

¶2. Deborah Banks and Marcus Banks married on July 26, 2003, in Leflore County, Mississippi, and separated on December 7, 2021. They had no children. Since 2002, Deborah had been employed at Mississippi Valley State University, where she worked as an Associate Director in the Financial Aid Office. At the time of the divorce proceedings, Deborah also held the title of Interim Director of that office.[1] Marcus was employed as the chief of the Greenwood Fire Department. In addition to this employment, Marcus maintained additional professional and business endeavors, including serving as a commissioner on the Greenwood-Leflore Hospital Board, operating a cattle farm with his uncle, and owning two rental properties.

¶3. Because Marcus earned income from multiple sources, he was the primary financial provider for the family. Marcus mostly paid for their home and lifestyle. Deborah used her income at her discretion, but she contributed to some of the household expenses, including trash service, internet, cable, gas, groceries, water, and her cellphone. Deborah also deposited approximately $200 per month in the couple's joint checking account for a loan payment.

*The Divorce Proceedings*

¶4. On December 7, 2021, Deborah filed a complaint for divorce in the Leflore County Chancery Court. Deborah's complaint initially alleged adultery and habitual cruel and

---

[1] Deborah intended to return to her previous role of Associate Director once the search for the Director was completed.

inhuman treatment as grounds for divorce and, alternatively, irreconcilable differences. On August 4, 2022, Marcus answered the complaint, alleging an affirmative defense of unclean hands.

¶5.     On January 18, 2023, Deborah and Marcus withdrew the fault-based grounds and agreed to proceed with the divorce on the ground of irreconcilable differences. They submitted the following issues for the chancery court to resolve: the division of the marital property (including debt), Deborah's request for temporary or permanent alimony, and attorney's fees requested by both parties.

*The Trial*

¶6.     A trial to determine the division of the marital assets and address the issues of alimony and attorney's fees was held on March 9, 2023, and both Marcus and Deborah testified regarding their financial circumstances, assets, debts, and contributions during the marriage as detailed in the succeeding paragraphs. The chancellor determined that the date of the trial (March 9, 2023) was the date of demarcation for purposes of classification of marital assets.

¶7.     Deborah's Rule 8.05 financial statement indicated that she had a monthly net income of $3,421.43. *See* UCCR 8.05. Marcus's Rule 8.05 financial statement reflected a monthly net income of $5,654.72, which included $4,304.72 from the City of Greenwood, $1,050 from his two rental properties, and $300 from the hospital board. However, because Marcus did not disclose his earnings from his cattle farming activities, nor compensation for any additional hospital board meetings he attended, the income Marcus reported on his Rule 8.05 financial statement was incomplete.

3

*The Marital Residence*

¶8.     The couple lived together in an apartment before they were married.  In November 2001, the couple chose, and Marcus purchased, a house for them located on Virden Drive in Greenwood, Mississippi.  When the house was purchased, the banker suggested placing the property only in Marcus's name because his credit was slightly better and adding Deborah's name to the deed later.  Although the parties were not yet married, they intended to share the home and eventually planned to build a larger residence in the future.

¶9.     In June 2021, the home flooded and required renovations in the amount of $30,000.  Marcus obtained an $11,000 loan to help pay some of those expenses, and he paid others with his credit cards.  While the renovations were being completed, the couple temporarily lived in a hotel.  At the time of the divorce proceedings, the house had a remaining debt of $83,069 with the Bank of Commerce.

*The Vacant Lots*

¶10.     In December 2018, the Banks purchased two lots, totaling approximately 3.8 acres, with the intention of building their "dream home."  However, the couple separated before the home building commenced.  The purchase price for the lots was $30,000 each, totaling $60,000.  To make the down payment of $46,000 on the land, the couple had used the equity from the marital residence as collateral for a loan.  This left a remaining principal balance of $14,000 on the loan for both the lots, which contributed to the $83,069 in debt on the marital residence.  Of the remaining balance on the loan on the lots, Deborah agreed to pay the $14,000 in monthly installments of $200 until paid in full.

4

¶11.    Deborah valued the land at $50,000 on her Rule 8.05, and Marcus did not list a value for the property on his Rule 8.05 statement.

*The Philipp House*

¶12.    Another property involved in the proceedings was a house located at 1774 Hayward Jacks Road in Philipp, Mississippi, which is in Tallahatchie County (The Philipp House). The home was originally built by Marcus's father. After his father passed away without leaving a will, Marcus's stepmother lived in the house; however, she failed to make the mortgage payments, and the bank foreclosed on the property.

¶13.    Having a business relationship with the bankers who financed his father's construction loan, Marcus obtained a $27,942 loan from State Bank & Trust, and he purchased the property from the Bank of Commerce after foreclosure. State Bank & Trust executed a special warranty deed to Marcus on August 14, 2015, prior to the parties' separation. Then, Marcus allowed his biological mother to live in the home, as the mobile home that she was living in was in poor condition. Marcus asserted that his mother would give him money toward the mortgage payments, and in turn, he would pay the bank. At one point, Marcus signed a quitclaim deed conveying the property to himself and his mother with rights of survivorship so that the property would remain "in the family." After his mother passed away in 2020, Marcus added his daughter's name to the deed, and his sister moved into the home. At the time of the divorce proceedings, Marcus's sister paid him $750 per month in rent.

¶14.    Deborah did not directly contribute any funds toward the Philipp House. Marcus, his

5

mother, and his sister paid all expenses of the home, including property taxes, insurance, and upkeep.

*The Mobile Home*

¶15. On his Rule 8.05 financial statement, Marcus did not list the mobile home, located at 412 Oak Street, that he inherited from his mother's estate. For the mobile home, Marcus paid a lot fee of $150 per month to Nikki and Michael Larry Investments because it was on their property. This fee was paid from the parties' joint CB&S Bank account. In return, Marcus received rent on the lot, which he deposited into a joint account.

*Other Financial Assets and Debts*

¶16. The couple also possessed various retirement accounts. Deborah maintained a PERS[2] retirement account valued at approximately $103,271.60, and a deferred compensation account valued at $7,345.96. Marcus maintained a PERS retirement account valued at $131,472.02. Prior to Deborah's employment at Mississippi Valley State, she worked for the Mississippi Department of Corrections. When she left her position in 1996, she withdrew her retirement funds from PERS, and the total amount is unknown. Later, she wanted to purchase her time back, and after a conversation with Marcus, the couple agreed to proceed with the repurchase costing approximately $34,000 to buy it back. On March 3, 2021, Marcus gave Deborah $17,000 toward the repurchase from PERS. Deborah contributed the remaining $17,000, which she withdrew from her deferred compensation account.

¶17. Marcus also maintained a savings account with CB&S Bank that did not include

---

[2] "PERS" stands for Public Employees' Retirement System of Mississippi.

Deborah's name. Marcus testified the money in that account came from his inheritance from his mother's life insurance proceeds and death benefits. Marcus served as the administrator of her estate, for which he received an administrator's fee of $6,000 and reimbursement of $4,887 for expenses that he incurred. According to Marcus, Deborah was aware of the money received as a result of the life insurance proceeds and administrator's fee. Deborah testified that Marcus owned another CB&S account and that he added her name to it. The couple also shared a joint account at the Bank of Commerce. Marcus also kept "anywhere from $3,000 to $5,000" in a safe in the home. Deborah alleged that she was not aware that Marcus kept money in the safe.

¶18. The couple also owned personal property, including household furnishings, vehicles, and farm equipment. Deborah drove a 2019 Lexus ES 350 with a loan balance of $18,700 and monthly payment of $792, and Marcus gave her $250 per month toward the payment. Marcus drove a 2021 GMC Sierra with a loan balance of $37,000. The couple also had various credit card debts and other loan obligations. These included a tractor note with a loan balance of $18,380.75, a note for a 2020 ATV valued at $15,000, Marcus's remaining student loan debt of $20,000, Deborah's remaining student loan debt of $14,376, and both their various credit cards.

*Banks & Banks ("B&B") Cattle*

¶19. Marcus was involved in the cattle business with his uncle. The pasture land was located in Cascilla, Mississippi. It is unclear who owned the land. Marcus testified that B&B Cattle was not a formally incorporated business and was not registered with the

7

Secretary of State's Office. Several years ago, Marcus's father and uncle got into the cattle market through a program at Alcorn State University, and the venture has operated for years. His father and uncle intended for their sons to inherit the business. Marcus stated that his father transitioned from raising cattle to raising goats. At some point, his father became ill, so Marcus sold the goats and deposited the profits into his father's account.

¶20. When Marcus's uncle became ill and needed help with the cattle, Marcus said that he became involved because he lived closer than his cousins. In 2021, Marcus purchased a bull to add to his uncle's twenty heifer cows. Of the herd, Marcus said he owned three heifers and one bull. In 2022, Marcus earned $6,000 from the venture. In 2023, he hoped to sell at least fifteen calves. However, Marcus stated that "all the profit never goes to [him]." Deborah testified it was her understanding that Marcus and his uncle owned B&B Cattle business, that Marcus helped maintain the farm, and that he often bought cattle feed.

*Deborah's Attorney's Fees*

¶21. Deborah's attorney's fees totaled $7,281.71. She had paid $4,500 of that fee, with her daughter contributing $3,500 and Deborah paying $1,000. This left a balance of $2,781.

*The Judgment*

¶22. On April 5, 2023, the chancery court entered a judgment in the matter dividing the parties' marital property (including debts), awarding Deborah alimony, and ordering Marcus to pay a portion of Deborah's attorney's fees. Also, the court explicitly stated that Marcus's Rule 8.05 financial disclosure was "problematic for the Court in that . . . his total actual income and expenses are not clearly reflected."

¶23.    The judgment contained various sections discussing the parties' marital and non-marital property.  Under the section on marital liquid assets, the chancellor addressed the relevant *Ferguson* factors.[3]

¶24.    The chancellor listed facts supporting the relevant *Ferguson* factors and included the following findings:

Retirement Accounts
(1) Marcus and Deborah worked during the marriage and contributed to the accumulation of marital assets, including their respective retirement accounts. Marcus contributed to Deborah's retirement account to restore funds she had previously withdrawn from PERS.

(2) Both parties considered their pensions as the result of their own labor.  But, that Marcus had $20,000 more than Deborah.

(3) Withdrawing funds from their retirement accounts would result in significant tax issues.

(4) Allowing each party to retain his or her individual retirement account would reduce future disputes.  Both were young individuals with the ability to substantially add to their retirement accounts.

Marital Property
(5) Both parties are equally attached to the marital home and have a need for a permanent home.  Marcus has access to two other pieces of property that he can utilize for the development of a permanent home.  He has far more access to financial tools to get the necessary credit to acquire another home than Deborah.

Nonmarital Property
(6)   Marcus possessed significant nonmarital property, including a house

_____

[3] The *Ferguson* factors include the (1) "[s]ubstantial contribution to the accumulation of the property; (2) disposition of assets; (3) market value and emotional value of the marital assets; (4) value of non-marital property; (5) tax or other consequences; (6) "extent to which property division may" reduce periodic payments and reduce friction; (7) financial needs of the parties; and (8) "[a]ny other factor which in equity should be considered." *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

valued at approximately $90,000 with about $18,336 in equity.

Disposition of marital assets
(7) Deborah used her earnings, mostly, as she chose, while Marcus's income supported the marital estate. The court noted this was a mutually agreed upon arrangement.

The financial needs of the parties
(8) The parties had the same financial needs, that they were young, well-educated healthy professionals, and there were no minor children. The court also noted that Marcus earned approximately $2,200 more per month than Deborah.

Any other factors which in equity should be considered
The court did not list this factor.

¶25. The chancellor ultimately ordered as follows: (1) Deborah was awarded the marital home and all the equity, $36,069. Deborah was also responsible for the upkeep of the home; (2) Deborah was to "remove" Marcus from any liabilities concerning the property; (3) Marcus was awarded the two lots of property totaling 3.8 acres. The $30,502 of equity in the property was evenly split ($15,000 to each), and Marcus was required to pay Deborah an additional $4,000 for the monthly installments on the remaining balance for the lots for which she had been paying; (4) Marcus was to "remove" Deborah from any liabilities concerning the land; (5) Deborah was granted the master bedroom furniture set, valued at $2,000, and Marcus was granted the remaining household furnishings, valued at $13,000; (6) Deborah was allowed to keep her wedding rings, the gun safe, and the couple's HP notebook computer, valued at $10,400. Marcus was allowed to keep all of the couple's other personal property, including outdoor and farm equipment, valued at $70,500; (7) Deborah and Marcus were allowed to keep their own retirement accounts and were awarded $1,500 each from the

10

couple's joint account, totaling $112,116.12 for Deborah and $132,972.02 for Marcus; (8) Deborah and Marcus were allowed to keep the cars that they drove. Each party was responsible for his or her car's upkeep; (9) Marcus was awarded the Philipp House, which the chancellor classified as non-marital property; (10) Marcus was ordered to pay Deborah $1,750 per month in alimony for a period of four years; and (11) Marcus was ordered to pay Deborah $6,900 in attorney's fees.

*Post-Judgment Proceedings and Appeal*

¶26. On April 14, 2023, Deborah filed a motion for clarification of the judgment, requesting a specific date for Marcus to refinance the two vacant lots and a date by which Marcus was required to move out of the marital residence. Marcus responded to the motion on April 16, 2023, and requested forty-five days to move from the residence. Marcus also challenged the chancellor's alimony award and the chancellor's reasoning for awarding Deborah a greater portion of the equity in the vacant lots totaling $19,000.

¶27. On April 21, 2023, the court entered an order clarifying the judgment, stating: Marcus had thirty days from the entry of the judgment to move out of the marital home (i.e., by May 6, 2023); (2) Marcus had forty days from the entry of the judgment to refinance the vacant lots; (3) The chancellor found that Deborah's $19,000 of equity in the vacant lots came from splitting the property's equity in half (each party receiving $15,251) plus accumulated equity that was acquired by Deborah in her payment of this debt during the course of the marriage; (4) Deborah had sixty days from the entry of the judgment to refinance the home and "remove" Marcus from any liabilities concerning the home; (5) the chancellor's ruling on

11

alimony was intentional. The chancellor noted that she was not bound by what a party requests as an alimony payment.

¶28. On April 26, 2023, Marcus filed a notice of appeal to the Mississippi Supreme Court.[4] On October 29, 2024, this Court reviewed the case and dismissed the appeal because the chancellor failed to grant a divorce in the judgment or order of clarification. Accordingly, the appeal was dismissed for lack of jurisdiction. Therefore, the jurisdiction remained with the chancery court.

¶29. On November 19, 2024, the chancellor entered an amended final judgment, specifically granting the parties a divorce, which Marcus appealed on November 27, 2024.

¶30. On appeal, Marcus contends that the chancellor erred and abused her discretion by awarding Deborah alimony that rendered Marcus financially inferior to her, awarding her the marital home and its equity, awarding Deborah attorney's fees, and awarding her equity in the vacant lots. Deborah filed a cross-appeal, contending that the chancellor erred by classifying the Philipp House as non-marital property and that the home should have been equitably distributed between the parties.

**STANDARD OF REVIEW**

¶31. "Under the standard of review utilized to review a chancery court's findings of fact, particularly in the areas of divorce, alimony[,] and child support, this Court will not overturn the court on appeal unless its findings were manifestly wrong." *Anderson v. Grabmiller*, 394 So. 3d 493, 500-01 (¶29) (Miss. Ct. App. 2024) (quoting *In re Dissolution of Marriage of*

---

[4] The record in that appeal, Case No. 2023-CA-00515, was consolidated with the current appeal.

*Wood*, 35 So. 3d 507, 512 (¶8) (Miss. 2010)). "For questions of law, our standard of review is de novo." *Id.* "Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Rhodes v. Rhodes*, 52 So. 3d 430, 435 (¶15) (Miss. Ct. App. 2011) (quoting *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)). We do not substitute our "judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion." *Id.* (quoting *Coggin v. Coggin*, 837 So. 2d 772, 774 (¶3) (Miss. Ct. App. 2003)).

¶32. "As a general rule, an error in classification requires that the case be reversed and remanded for division based on proper classification." *Davis v. Davis*, 361 So. 3d 725, 734 (¶33) (Miss. Ct. App. 2023) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[1], at 144 (3d ed. 2020)). However, under certain circumstances, the division may be affirmed despite a classification error if the overall division is considered fair. *Id.* A division of marital property will be reversed if it is based on findings of fact that are "manifestly wrong or clearly erroneous." *Bowman v. Bowman*, 332 So. 3d 317, 326 (¶19) (Miss. Ct. App. 2021) (quoting *Sanderson v. Sanderson*, 824 So. 2d 623, 625 (¶8) (Miss. 2002)).

¶33. "It is hornbook law that whether to award alimony and the amount to be awarded are largely within the discretion of the chancellor," *Pace v. Pace*, 324 So. 3d 369, 380 (¶38) (Miss. Ct. App. 2021) (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 517 (Miss. 1995)), and "his discretion will not be reversed on appeal unless [he] was manifestly in error in his finding of fact and abused his discretion." *Weatherly v. Weatherly*, 412 So. 3d 276, 300

13

(¶55) (Miss. Ct. App. 2024) (citing *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)). However, "if we find that the court applied an erroneous legal standard, we will not hesitate to reverse." *Id*. "[W]hen reviewing decisions on alimony, we do not apply or reweigh the *Armstrong* factors de novo but instead recognize that alimony awards are within the discretion of the chancellor, and will not be reversed on appeal unless the chancellor abused his discretion." *Anderson*, 394 So. 3d at 500 (¶29) (quoting *Layton v. Layton*, 181 So. 3d 275, 279-80 (¶10) (Miss. Ct. App. 2015)).

¶34. The awarding of attorney's fees is "largely entrusted to the sound discretion of the chancellor." *Faerber v. Faerber*, 150 So. 3d 1000, 1009 (¶31) (Miss. Ct. App. 2014) (citing *McKee v. McKee*, 418 So. 2d 764, 767 (Miss.1982)). Therefore, "[w]e are reluctant to disturb a chancellor's discretionary determination whether or not to award attorney's fees[.]" *Id*. Moreover, "neither party is entitled to attorney's fees unless the requesting party has established the inability to pay." *Id*. (quoting *Dorsey v. Dorsey*, 972 So. 2d 48, 51 (¶5) (Miss. Ct. App. 2008)). However, "[a]n award of attorney's fees must be supported by sufficient evidence for an accurate assessment of fees." *Watts v. Watts*, 99 So. 3d 751, 764 (¶39) (Miss. Ct. App. 2012). "[A] trial court's decision regarding attorneys' fees will not be disturbed by an appellate court unless it is manifestly wrong." *Blumer v. Majestic Homes LLC*, 411 So. 3d 251, 262 (¶39) (Miss. Ct. App. 2025) (quoting *Tupelo Redev. Agency v. Gray Corp.*, 972 So. 2d 495, 521 (¶81) (Miss. 2007)).

## DISCUSSION

### I.     Direct Appeal: Equitable Distribution of the Marital Estate

14

¶35. Under Mississippi law, "[t]o equitably divide property, chancellors must: (1) classify the parties' assets and liabilities as marital or separate, (2) determine the value of the property, and (3) divide the marital property equitably." *Warner v. Warner*, 341 So. 3d 152, 159-60 (¶22) (Miss. Ct. App. 2022). After classification, "[t]he usual requirement is for a chancellor to employ the *Ferguson* factors, which requires a determination of fair market value of the assets." *Brodie v. Brodie*, 427 So. 3d 853, 872 (¶59) (Miss. Ct. App. 2025) (citing *Drumright v. Drumright*, 812 So. 2d 1021, 1025 (¶9) (Miss. Ct. App. 2001)). After classification and valuation, the chancery court must then equitably divide the marital assets. "Property division should be based upon a determination of fair market value of the assets," *Davis*, 361 So. 3d at 734 (¶33), but "an equitable division of property does not necessarily mean an equal division of property." *Whitlock v. Whitlock*, 421 So. 3d 638, 647 (¶27) (Miss. Ct. App. 2025) (quoting *Chamblee v. Chamblee*, 637 So. 2d 850, 863-64 (Miss. 1994)). Rather, "fairness is the prevailing guideline in marital division," *id.* (quoting *Ferguson*, 639 So. 2d at 929), and the equitable distribution requires a holistic assessment of both parties' financial circumstances, contributions to the marriage, and future economic prospects. *Whitlock*, 421 So. 3d at 648 (¶29).

¶36. In the instant case, the chancellor, citing *Ferguson*, classified the following assets as marital property: (1) the marital home, (2) the 3.8 acres, (3) the household furnishings, (4) the personal property (tractor, guns, lawn equipment, ATVs), (5) the separate retirement accounts, (6) vehicles, and (7) the marital debt. However, the court classified the Philipp House as non-marital property.

15

¶37. Also of concern is the fact that the record reveals that there were other assets and debts that the chancellor did not classify one way or the other. These include: Deborah's four bank accounts: (1) Planter's Bank: $1,496.28, (2) Regions Savings: $502.08, (3) Bank Plus Checking: $101.17, and (4) Jackson FCU Savings: $1,042.58; the joint CB&S checking account with $6,152, Marcus's inherited items (i.e., another CB&S bank account with a remaining balance of $29,004 holding his mother's life insurance proceeds and the mobile home). *See Allgood v. Allgood*, 62 So. 3d 443, 446-47 (¶10) (Miss. Ct. App. 2011). The record also reflects six life insurance policies, with conflicting testimony regarding whether they were whole or term life policies and whether they had carried cash value.[5] *Davis*, 361 So. 3d at 735 (¶¶37-38). The chancellor mentioned in her judgment that Marcus "has non-marital assets in the form of cash and cash generating property" and that "[h]e is engaged in the cattle business with his uncle"; however, because there was limited information in the record to establish Marcus's exact income from engaging in the cattle business, the chancellor's judgment did not include any income or classification for Marcus from B&B Cattle. Thus, Marcus's additional income from B&B Cattle was not included in the overall classification, valuation, and distribution of assets.

¶38. Because the chancellor did not include and address all relevant assets, the equitable distribution is incomplete. Accordingly, we will reverse and remand on the division of the marital property. Mississippi law requires that marital assets be identified, classified, and

---

[5] (1) Primerica: $100,000; (2) Primerica: $100,000; (3) Farm Bureau: $75,000; (4) New York Life: amount unknown; (5) AFLAC: amount unknown; and (6) City of Greenwood: amount unknown.

valued prior to division. "As a general rule, failure to do so is reversible error and requires that the case be reversed and remanded for division based on proper classification." Deborah H. Bell, *Bell on Mississippi Family Law* § 6.02[1], at 144 (3d ed. 2020). We will therefore remand this matter with instructions to have the parties submit evidence upon which the chancellor can properly classify all the parties' assets and debts listed on both parties' Rule 8.05 financial statements and those items included in testimony. In addition, the chancellor should classify and value B&B Cattle, which might help determine the overall outcome of the equitable distribution. *Davis*, 361 So. 3d at 735-36 (¶38). Moreover, the chancellor should include the value of each item in the equitable division. *Id.* at 738 (¶42). On remand, since the above-stated assets were not classified one way or the other, the chancellor should fully classify, value, and equitably distribute all the assets within the marital estate.

¶39. The chancellor awarded Deborah the marital home, which was valued at $119,750, along with all the equity in the home, which totaled $36,681. Because we are reversing and remanding this case for the chancellor to review the entire marital estate, it should be noted that Marcus argues on appeal that the chancellor erred in awarding Deborah all the equity in the home, as well as $19,000 in equity in the vacant lots. Marcus further argues that the chancellor erred by awarding Deborah the marital home because he paid the majority of the "marital expenses." Deborah counters, contending that this award of the marital home with the equity was appropriate in light of the overall distribution of the marital estate.

¶40. The chancellor also awarded Marcus the vacant lots comprising the 3.8 acres, along with half of the equity in that land. But because Deborah had paid $4,000 toward the

17

remaining loan balance for the land, the chancellor credited a $4,000 reimbursement for her loan payments on that land. Ultimately, Marcus received $11,502 in the land, and Deborah was awarded $19,000 of the equity in the land. The lots were valued at $50,000, with $19,498 owed on the loan, totaling $30,502 in equity. On appeal, Marcus argues that the chancellor erred by awarding Deborah $19,000 of the equity in the vacant lots. Deborah counters, again contending that this award, $19,000 of the equity, was appropriate in light of the overall distribution of the marital estate. Equitable distribution of the marital estate also includes the equity in the marital home, which must be considered in the overall distribution. *Hearn v. Hearn*, 191 So. 3d 129, 132-33 (¶¶12-15) (Miss. Ct. App. 2016).

¶41.    Here, Deborah's total equity in the marital home was $36,681, and her total equity in the lots was $19,000. In contrast, Marcus's total equity in the lots was $11,502. In total, the combined equity amount between the marital home and the lots was $67,183. Of the $67,183 in equity, Deborah received approximately $55,681 in equity. Meanwhile, Marcus received approximately $11,502 in equity. This distribution of equity awarded Deborah approximately eighty-two percent of the total equity in these two marital properties, and Marcus was only awarded approximately eighteen percent. Notwithstanding the uneven distribution of the marital equity, as "an equitable division of property does not necessarily mean an equal division of property," we refrain from addressing this issue on appeal since the chancellor will be considering the entire marital estate on remand. *See Ferguson*, 639 So. 2d at 929. In summary, we reverse the chancellor's amended final judgment and remand on the issue of equitable distribution of the marital home and the lots, which might be affected by other

18

properties that are valued and classified.

## II.     Granting Deborah Alimony

¶42.    In its amended final judgment, the chancellor applied the *Armstrong* factors and awarded Deborah $1,750.00 per month for four years, totaling approximately $84,000, but, the chancellor did not identify the type of alimony being awarded.[6]  Marcus argues that the chancellor abused her discretion because, among other things, the award of alimony was based on an incomplete and erroneous distribution of the parties' assets.

¶43.    Although "[a]limony and equitable distribution are distinct concepts, . . . together they command the entire field of financial settlement of divorce.  Therefore, where one expands, the other must recede." *Gutierrez v. Gutierrez*, 233 So. 3d 797, 807-08 (¶22) (Miss. 2017). "[A]limony and equitable distribution should be considered together so as to prevent inequity." *Id*. (quoting *Watson v. Watson*, 882 So. 2d 95, 98 (¶15) (Miss. 2004)).  "In the final analysis, all awards should be considered together to determine that they are equitable and fair." *Id*. (quoting *Ferguson*, 639 So. 2d at 929).  Thus, it follows that "when a case is remanded for further consideration of the division of the marital assets," as here, "this Court must also remand on the issue of alimony as the proper distribution of the parties' assets and debts may affect the amount of alimony ultimately awarded." *Id*. at (¶60) (quoting *Williams v. Williams*, 303 So. 3d 824, 835 (¶41) (Miss. Ct. App. 2020)).  As the supreme court has long recognized, remand is necessary because "[a]ll property division, [including] lump sum or periodic alimony payment . . . should be considered together." *Aultman v. Aultman*, 426

---

[6]  *Armstrong*, 618 So. 2d at 1280 (identifying twelve factors courts should use to determine whether a party is entitled to alimony).

So. 3d 1178, 1194 (¶61) (Miss. Ct. App. 2026) (quoting *Ferguson*, 639 So. 2d at 929).

¶44. "Alimony is considered *only after the marital property has been equitably divided* and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003) (emphasis added). "[T]he 'deficit' to which our cases refer is not one spouse's receipt of assets with a lesser net value than those allocated to the other spouse. Rather, the question is whether the spouse seeking alimony is left with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses." *Id*. "If the equitable division of property leaves neither spouse with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses, then no alimony award is appropriate." *Randolph v. Randolph*, 199 So. 3d 1282, 1287 (¶19) (Miss. Ct. App. 2016).

¶45. We note that the chancellor did not classify the type of alimony awarded. Mississippi has four types of alimony: periodic, lump sum, rehabilitative, and reimbursement. *Anderson v. Grabmiller*, 394 So. 3d 493, 501 (¶32) (Miss. Ct. App. 2024) (quoting *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011)). "[R]ehabilitative alimony is similar to periodic alimony, but it includes a 'time limitation' so that it is payable only for a 'fixed period.'" *Id.* at (¶34). The purpose of rehabilitative alimony is to "allow[ ] the party to get back into the working world in order to become self-sufficient." *Id*. (quoting *Lauro*, 847 So. 2d at 849 (¶15)).

¶46. Here, because the equitable distribution and alimony should be considered together, and because we are reversing the chancellor's equitable distribution of the marital and

20

nonmarital estate, the equity, the other above-mentioned items within the marital estate, and the Philipp House,[7] on remand the chancellor must reconsider the alimony award and also determine the type of alimony to be awarded.

### III. Deborah's Award of Attorney's Fees

¶47. The chancellor awarded Deborah $6,200 in one place and $6,900 in another place in the amended final judgment for attorney's fees after concluding that the *McKee* factors weighed in Deborah's favor and that she had established an inability to pay.

¶48. The chancellor's order, as related to attorney's fees, stated in part:

> As noted extensively above, Marcus is more financially sound than Deborah. This handicap was well developed throughout this nearly 20 year marriage. Marcus has the ability through non traditional educational means, to greatly increase his monthly income. Deborah must acquire additional costly educational enhancement to increase her monthly earning capacity. . . .
>
> It is clear that Deborah has made no preparation to support herself. It is also clear that Marcus fully supported her living basically a financially carefree life. Having found that Deborah has an inability to pay her attorney's fees and that the *McKee* factors all weigh in favor of reasonableness, Marcus' request for attorney fees is DENIED and he is ordered to pay Deborah $6,200.00 for her attorney fees.

Based on these findings, the chancellor concluded that Marcus was in the stronger financial position and that Deborah lacked the ability to pay her attorney's fees. The chancellor further found that Deborah was not prepared to support herself.

¶49. Marcus argues that the chancellor abused her discretion in awarding Deborah attorney's fees because the record lacks credible evidence demonstrating Deborah's inability to pay her own fees. Deborah counters that she did lack the ability to pay and that her

---

[7] *See infra* ¶¶53-57 (discussing cross-appeal).

testimony on this was uncontradicted, noting that she borrowed $3,500 from her daughter to pay her attorney's fees.

¶50.   Under Mississippi law, "[w]ith respect to the amount of attorney's fees, the decision to award attorney's fees in a divorce proceeding is left to the sound discretion of the chancellor." *Manor v. Manor*, 404 So. 3d 1256, 1265 (¶21) (Miss. Ct. App. 2024) (citing *Gilmer v. Gilmer*, 297 So. 3d 324, 340 (¶55) (Miss. Ct. App. 2020)); *see also Faerber*, 150 So. 3d at 1009 (¶31) ("The awarding of attorney's fees is largely entrusted to the sound discretion of the chancellor." (quoting *Rhodes*, 52 So. 3d at 449 (¶77))).  However, "[a]n award of attorney's fees must be supported by sufficient evidence for an accurate assessment of fees." *Watts*, 99 So. 3d at 764 (¶39).  Indeed, "neither party is entitled to attorney's fees unless the requesting party has established the inability to pay." *Id.* (quoting *Dorsey*, 972 So. 2d at 51 (¶5)).  "The party seeking attorney's fees is charged with the burden of proving inability to pay." *Id.* (citing *Jones v. Starr*, 586 So. 2d 788, 792 (Miss. 1991)).

¶51.   In assessing attorney's fees, this Court applies the following factors set out in *McKee*, 418 So. 2d at 767:

> [t]he "relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case."

*Manor*, 404 So. 3d at 1266 (¶24).

¶52.   Under the circumstances of this case, we find that on remand, the chancellor, in her discretion, may still award Deborah attorney's fees should she find an inability to pay on

22

Deborah's part and relative financial disparity between the parties. *Aultman*, 426 So. 3d at 1199 (¶80). If the chancellor determines that attorney's fees for the divorce proceeding should be awarded, she should, again, utilize the *McKee* factors in determining the proper amount of such award, and she should clarify the proper amount. *Id.* Additionally, because we are reversing and remanding this case for the chancellor to reconsider the equitable distribution of the marital assets, we likewise instruct the chancellor on remand to reconsider the award of attorney's fees after proper division of the marital property. *See Lauro*, 847 So. 2d at 850 (¶18) (recognizing that "[e]quitable distribution is the first step in all divorce matters; therefore, . . . . this case is [also] remanded so that the chancellor may revisit the award of attorney's fees, if necessary, after he has properly divided the marital property and awarded child support and alimony"); *see Clark v. Clark*, 43 So. 3d 496, 502 (¶25) (Miss. Ct. App. 2010) (recognizing that in *Lauro*, "the supreme court held reversal of a chancellor's distribution of property also required reversal of the chancellor's award of attorney's fees").

## IV. Cross-Appeal: Classification of the Philipp House

¶53. The chancellor classified the Philipp House as non-marital property and awarded it to Marcus with $18,336 in equity and a remaining mortgage of $71,664. The chancellor found in her judgment that it "was inherited by Marcus at the passing of his parents," though she recognized that "this property could possibly be considered a marital asset." Deborah cross-appeals, contending that the chancellor incorrectly found that the Philipp House was non-marital property because Marcus used marital funds to purchase the house from a foreclosure sale; thus, it should be classified as marital and subject to equitable division. On

the other hand, Marcus argues that the chancellor correctly classified the Philipp House as non-marital because Deborah did not make any material contributions to the property.

¶54.    First, the chancellor must "classify each asset as marital or non-marital." *Dean v. Dean*, 304 So. 3d 156, 168 (¶47) (Miss. Ct. App. 2020) (quoting *Larue v. Larue*, 969 So. 2d 99, 104 (¶11) (Miss. Ct. App. 2007)).  "Marital property" includes "any and all property acquired or accumulated during the marriage." *Faerber*, 150 So. 3d at 1005 (¶12) (quoting *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994)).  These assets are subject to equitable division unless proven to be attributable to one party's separate estate prior to or outside the marriage.  *Hemsley*, 639 So. 2d at 914.  Although "[g]ifts and inheritances received during a marriage constitute the separate property of a spouse," a spouse seeking to classify property as separate may maintain that separate interest by "tracing the asset to a separate-property source." *Neely v. Neely*, 305 So. 3d 164, 168 (¶¶13, 14) (Miss. Ct. App. 2020).

¶55.    Here, we first find that the chancellor's statement that the Philipp House "was inherited by Marcus at the passing of his parents" was erroneous.  Although gifts and inheritances are generally separate property, the record, documents, and testimony reflect that Marcus initially inherited an interest in the Philipp House, but his interest was lost as a result of foreclosure.  "[A] valid and effective foreclosure extinguishes all subordinate rights." *WBL SPO I, LLC v. West Town Bank & Tr.*, 359 So. 3d 1069, 1074 (¶22) (Miss. 2023).  Marcus then purchased the house at a foreclosure sale in August 2015, which was during the marriage.  The nature of Marcus's interest in the Philipp House was not as an heir, but as a

24

bona fide third-party purchaser. Marcus obtained a $27,000 loan from State Bank (later Bank Plus) to complete the purchase. After completing the purchase, Marcus issued a quitclaim deed to himself and his mother. After his mother passed, Marcus "added" his daughter's name to the deed. The record further reflects that Marcus rented the house to his sister for $750 per month.

¶56. In March 2021, Marcus refinanced the loan with Bank of Commerce when they offered him a lower interest rate than Bank Plus. In that loan, Marcus also borrowed an additional $50,000, using the bulk of these funds to pay marital debt acquired from the couple's credit card usage, leaving him with approximately $4,737 after making those payments. Marcus agreed that he may have deposited those remaining funds into the joint Bank of Commerce account.

¶57. Because the chancellor's statement that Marcus "inherited" the Philipp House when his parents passed was erroneous, we reverse the chancellor's amended final judgment on this cross-appeal and remand for the chancellor, in light of the foreclosure, to reconsider the classification, valuation, and equitable distribution of the Philipp House in the parties' marital estate. In addition, the chancellor should consider whether Marcus kept the purchase of this house sufficiently separate, since it was acquired through a financed purchase during the marriage, not by inheritance. A spouse must be able to trace the funds back to the separate-property source to overcome that presumption. *Ware v. Ware*, 387 So. 3d 1050, 1054 (¶15) (Miss. Ct. App. 2024). If the property has become marital property, then this reconsideration should include the value of the Philipp House, the remaining mortgage

25

amount of $71,664, and the equity. In so ruling, however, we point out that "[e]quitable distribution does not require equal distribution. Rather, equitable distribution is a fair division of marital assets during the marriage." *Chapman v. Chapman*, 395 So. 3d 447, 456 (¶26) (Miss. Ct. App. 2024) (citation omitted). Thus, in determining the equitable division, the chancellor is free to consider all evidence before her, including the division of the marital assets and the award of the marital home. *Aultman*, 426 So. 3d at 1193 (¶51).

**CONCLUSION**

¶58. In conclusion, we reverse the chancellor's amended final judgment and remand for further proceedings for the chancellor to reconsider the proper classification of the marital and non-marital property, as well as the equitable distribution of all the assets. This will include the Philipp House, any and all bank accounts listed in the Rule 8.05 financial disclosures, the mobile home (and whether it was commingled), and any other property that may not have been classified, valued, and distributed.

¶59. Because we find that there should be a review of the reclassification of a major marital asset, the Philipp House, along with the additional marital assets, we remand on the issue of the distribution of the equity in the marital home and lots to be reconsidered in light of the entire marital estate.

¶60. We find that the chancellor's alimony award must also be reconsidered on remand in light of the potential changes to the classification, valuation, and equitable distribution of the marital and non-marital property.

¶61. Regarding the attorney's fees, on remand, we instruct the chancellor to reconsider

26

whether Deborah is entitled to attorney's fees in accordance with *Aultman*, 426 So. 3d at 1199 (¶80).

¶62. **ON DIRECT APPEAL: REVERSED AND REMANDED. ON CROSS-APPEAL: REVERSED AND REMANDED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. WILSON, P.J., AND LASSITTER ST. PÉ, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**